DAVID GEORGE AND OTHERS v. WILLIAM R. THOMAS AND OTHERS.

Where part of a tract of land has been sold by description, and the owner of one part refuses to permit the owner of the other to run the line where the latter claims it should be run, the latter may bring suit to have the line judicially ascertained and determined; but if it appear that the division line has been previously ascertained and marked by the parties or their privies, the suit cannot be maintained.

Where an intelligible case, entitling the plaintiff to relief if admitted, is stated in the petition, objections for want of particularity, cannot be made on general demurrer.

Where a division line has been run by the parties in interest, it cannot be disregarded because it cannot be found in its whole extent, nor because it may not have been run through ; it is sufficient if it can be ascertained in any of the well established modes of discovering the lines of surveys.

A line actually marked must be adhered to, though it vary from the course ; and although not a right line from corner to corner.

Where a line has been marked only a part of the way, the boundary for the residue of the distance will be a direct line from the termination of the marked line, to the point of intersection, or to the corner called for.

Where a division line exists at its two extremities, and for a principal part of the distance, it will be considered a continuous line.

The rule with respect to the identification of division lines, between a grantor

and his grantee of part of a tract, and those claiming under them, is the same, whether the deed or conveyance refer, for its boundaries, to the marked lines or monuments, or they be afterwards marked and established by the parties.

The foregoing rules in favor of marked lines are more especially true where there has been long continued occupation in reference to the lines as marked.

Where parties have agreed upon and marked a boundary line, and the possession is in accordance with it for such a length of time as may give title by disseizin, the line cannot be disturbed, although found to be erroneously established, unless there be clear proof that the possession was not adverse.

See this case as to the assent of married women and minors to the establishment of boundaries.

See this case as to the recognition of a line as run and marked, as distinguished from an imaginary line.

The declarations of a public surveyor while making a survey, as to what he is doing and for whom, are part of the *res gestae*, and admissible in evidence as such. The Court said that if it had been intended by the objection, that the surveyor ought to have been produced as a witness, it should have been so stated, and his absence might then have been accounted for.

Appeal from Wharton. This suit was brought by the appellees Wm. R. Thomas, Rob't. S. Thomas, Wm. T. Stevens, Jno. C. Thomas and Harris Tinker. The petition alleged that the plaintiffs were the owners of the lower half of a league of land granted to Eli Hunter as a colonist of Austin's Colony in the year 1824; described the said league, and set forth its metes and bounds; alleged that in the year 1826 the said Eli Hunter sold and conveyed to Freeman George the upper half of said league, to be surveyed in the following manner, viz:

Beginning at the upper corner of said league No. 3, which is the lower corner of league No. 2, on the bank of Peach creek; thence running S. 20° W. 8340 v. to the S. E. corner of said league No. 2; thence to the S. E. by the W. line of said league No. 3 to a point from which a line running N. 20° E. to the said creek, and thence following the said creek to the place of beginning, will include the said half of said league of land.

That the upper half of said league had never been surveyed and partitioned from the lower one-half according to the terms and provisions of said sale and conveyance, and remained undivided; that said upper one-half was claimed by and belonged to David George, Lemuel Callaway, James G. Hunt, George W. Tilley, Mason L. Weems, Wm. L. Hathaway, Hardy Hill, Benj. F. Cage, and Sam'l. B. Brigham, who were made defendants in said suit; that said defendants and each of them had been often and amicably requested to consent to a partition of said upper from the lower half, and they had hitherto refused and still refused to permit any partition whatever of said land to be made. The prayer was, that the upper half of said league be partitioned and divided from the lower half of said league according to the terms and meaning of the sale and conveyance aforesaid; and that the partition and division line be run between them, be plainly marked and established by the judgment and decree of the Court and for general. relief. The petition was filed July 19, 1853.

The defendants answered :

1st. A general demurrer.

2d. A general denial, except that said defendants were the owners each of the parts held by them of the upper 1-2 league in severalty.

3rd. That they and those under whom they claim have been in possession of all the lands which they claim on said upper half league, for more than three years under title, and that plaintiffs did not sue within three years after their cause of action accrued.

4th. Plea of five years possession, cultivating, using, and enjoying the same, and paying taxes thereon under deeds duly registered.

5th. Plea of ten years possession.

6th. That the said league of land had been, more than twenty years before the institution of the suit, partitioned and divided into half leagues, an upper half the same held by de-

fendants, and the lower half, the same pretended to be held by plaintiffs ; that the partition line was then surveyed and well marked, and the corners thereof well and permanently established ; that said line is well known and distinguished by the corners thereof and by many good and sufficient marks upon said line ; that said line was run, marked and established between the respective owners more than 20 years before, and for more than 20 years had been known, recognized and acknowledged by the owners of land on said league as the established partition line between the upper and lower halves of said league.

7th. That said league of land had been long since and was then divided by a well established line.

An amended answer was filed which alleged,

8th. That at the times the plaintiffs purchased their respective interests in the lower 1-2 league, the defendants and those under whom they claim were in peaceable and adverse undisturbed possession and enjoyment of the upper 1-2 league up to the dividing line, and had been for a long time, and that said plaintiffs well knew said defendants were so in possession with their fences and improvements up to and upon the said dividing line ; that said plaintiffs then and for a long time afterwards admitted, recognized and acquiesced in said dividing line between the said upper and lower halves of said league.

9th. The running and existence of the dividing line as before shown ; that it was notorious, known and acquiesced in by plaintiffs and by those under whom they claim, and by all parties interested in said league of land, and until the institution of this suit there had been no pretence to the contrary set up.

10th. It is averred that the possession set forth in former answers and pleas up to said dividing line had been always adverse.

PLAINTIFFS' EVIDENCE.

Title to Eli Hunter for league No. 3.

Deed from Hunter to Freeman George for the upper half of said league, "said upper half thus sold is to be surveyed in "the following manner," the same set out in the petition.— The deed put the said George in full and complete possession of said tract of land, in the form of that period.

Partition Deed, Sept. 26, 1848, between Wm. D. Lacy and Sally, his wife, and Dan'l M. Wheeler and Lavinia, his wife, of the said lower half league of land, assigning to said Sally Lacy the half thereof, her quarter of the league to commence on Peach creek, *at the "dividing line* between the upper half "and lower half of said league No. 3, *thence up the said divid- "ing line* to a point about the centre of the said half league, so "as to divide the said half league into two equal parts, and being the lower 1-4 fronting on Peach creek.

The quarter league of the said Lavinia to commence on *the corner of the dividing line* (which will be the front) between the upper half and the lower half of the said league No. 3, thence to a point about the centre of said league, so as to divide the said half league into two equal parts. She to have the half fronting on the prairie.

Deed from Lacy and wife to Robert and William Thomas, Sept. 26, 1848, for 1-4 league, or 1107 *acres, (be the same more or less,)* of said league of land, to commence on Peach creek, at the dividing line between the upper and lower half of said league No. 3, thence up the said dividing line to a point, &c., being the upper half of said half league, having the whole front on Peach creek.

Deed from Wheeler and wife to Jno. C. Thomas, Dec. 9, 1850, for the other quarter of said league ; referring to the partition, described the same as follows : That 1-2 of the lower 1-2 of said league of land No. 3, in the S. W. end, fronting on Bay Prairie, *of the division line of* said league of land No. 3, and *following said division line* to the centre of said league, so as to include exactly one half of the lower 1-2 of said league of land.

The titles of the plaintiffs to the lower half of the league were admitted.

### THE DEFENDANTS' EVIDENCE.

The titles of the defendants to the upper half of the league were admitted.

Testimony of J. T. Benton. Knows the Hunter league; lived last year at David George's on the upper 1-2 league and made a crop; John Thomas, below the line, and David George occupy to the dividing line between the upper and lower 1-2 leagues; their dividing fence is on the line; J. C. Thomas assisted in laying and making that fence, furnished his part of the rails. George W. Tilley above the line and Wm. R. and Robt. Thomas below the line adjoin. Wm. Stevens and Robt. Thomas adjoin Henry Cayce. Knows the line between the upper and lower half leagues; it is marked with three hacks or chops upon the trees; found another line marked with a cross and three hacks; started from the corner on Peach creek and followed the line marked 3 hacks to the base line or what he supposed to be the base line; found David George's and Jno. C. Thomas' fence upon the line. It crooks a few feet on either side of the line. Jno. Thomas assisted in laying that fence. Has known the line a little better than 3 years; was with Collinsworth, the surveyor, when he found the base line on a former occasion, and thus knows the base line; followed the line the whole way except where it was too thickety. There is a marked line every where except through the cane where he did not find any. The line marked 3 hacks looks older than the other which looked to be only 3 or 4 years old. Did not examine how old the old line was. Marks were generally plain, but in some instances rather grown out, some of the marks bulged out. Believes he saw some elm trees rather small, perhaps not more than 6 or 8 inches in diameter, which were marked. Thinks some of the marked trees were hackberries. Went along the line at the request of one of defendants' counsel, with a view to inform

himself as to the line. There is a sycamore marked on the line at George's fence; thinks in Thomas' field; may be in George's, close to the fence; Cayce's fence is on the line, perhaps crosses it at the creek.

Testimony of Lemuel Stubbs. Was with last witness in following the line; testified to same facts. The line was apparently 12 to 15 years old; mile and a half to two miles fencing on the line; Thomas' fence more than a mile on it; no difficulty in following the line.

Evidence of Chas. Messer, a release being filed by Tilley.— Acted as one of the chain carriers in running the said dividing line from Peach creek as far as Caney in 1835; the surveyor, Thos. J. Tone, measured from the upper line of the league and established a corner for the dividing line on Peach creek; witness then lived in the neighborhood and has been since 1832; not able to say when the continuation of the line was made; the line was run between Freeman George's 1-2 and Lacy's 1-2 for F. G. and Lacy; knew a dividing line in 1832 which was then occupied as the dividing line; knew that the Cage tract was occupied in 1832 by Caleb Kemp, and has been occupied ever since; the Higgins tract, formerly a part of witness' land, now part of the Tilley tract, since 1833, and the tract formerly owned by witness, now by Tilley, since '33 by witness and Tilley. The Georges occupied and lived on the upper 1-2 before witness came to Texas in 1832, with their fence in about 100 yards of the dividing line. The Thomases first came to Texas in 1848 or 9, up to which no person had ever lived on the lower 1-2 of the league. When they bought their land, witness' fence was not quite up to the line; in 1850 he placed it within 4 to 8 feet of the line.— Cage's fence was up to the line. Carried the chain past the whole length of the Cage and Tilley tracts, but not much beyond that. Freeman George lived on the upper 1-2 league till 1834, when he died, and his family have lived on it ever since. Lacy, his wife or daughter, was not on the land when the line was

run; they lived in Matagorda county; Lacy has been often on the land since then; never heard him complain of the line.— Tone was a public Surveyor; knew him in that capacity from 1832; was Deputy under Wightman and acted in that capacity in 1835. Tone said he was making a survey to establish the dividing line between the upper and lower halves of the league, for the parties and by them requested, as they were dissatisfied with the old line. The old line run about 50 varas below the line run by Tone in 1835. Jefferson George, son of F. G., was a chain carrier in running the line. F. G. died in 1834. There was an agreement to run the line before his death. Tone established a corner of the dividing line on the bank of Peach creek, and witness accompanied him as chain carrier in running over 4000 varas of the dividing line. They began at the upper line of the league, ran across half the league and made a corner. In 1835 House occupied the Cage tract down to the line, or very near it—right to the line, he thinks. They all recognized the line in 1835. Does not know of his own knowledge that Lacy, his wife or daughter knew of the running of that line. They surveyed down half way of the league; thinks they did not survey the lower half; never heard any complaint of the line until lately; within about two years heard Thomases complain of it. In 1838 Kemp occupied right on the Tone line.

Testimony of S. Cayce. In 1836 knew Ben Cage in possession of his tract of the upper half of the league, which has been occupied ever since. In 1835 the Tilley tract was occupied by Messer and has been ever since by him and Tilley; thinks in 1848 the Thomases made their first purchase on the lower half. Some of the owners on the upper half were then occupying down to their present line; heard plaintiffs Robert and Wm. Thomas say they were satisfied with the line of their land and gained from 80 to 90 acres by it, as they paid so much an acre for a certain number of acres, the overplus they had gained. All the Thomases have fenced up to the Alabama

road ; their fences are all in a line. Knew Thomas J. Tone as a public Surveyor from 1833 down.

John Foster, Assessor and Collector for eight years, proved that defendants and those under whom they claimed had always paid their taxes regularly on the upper half league.— Plaintiffs had paid on the lower half since they had owned it.

### PLAINTIFFS' REBUTTING TESTIMONY.

James B. Collinsworth testified that he was District Surveyor ; that in 1849 he was called by plaintiffs to survey their half league ; commenced at lower corner of the league and found the Tone corner on Peach creek, spoken of as the corner of the dividing line ; traced said line and found it running 19 3-4 instead of 20° ; traced said dividing line past Tilley's and George's land ; found the line marked 3 hacks through the timber, but lost it in the cane ; found Tone's trail through the cane, but thinks it was surveyed by Tone when running a line for Loverin ; could'nt trace the line by any marked trees further than the timber ; found a corner on the base line on a live oak ; found a line running from the live oak but it would not meet the other. If the line running from the live oak had been extended it would have passed wide of the point to which he traced the line from the other corner about thirty varas. From the corner on the base line found the marked line extending to Caney. To continue the line of 1835, from Tone's corner on Peach creek in same direction in which it runs through the timber, makes a difference between the upper and lower halves of the league of from 80 to 100 acres ; the upper gaining so much. To run the line through straight from corner to corner the upper would be the larger by 15 acres. To run from the point to which he could trace the line from Peach creek to the corner on the base line, the live oak would still leave the upper half larger than the lower ; can't say how much. In running out the line of 1835, found Cage's fence upon it ; Higgin's fence upon it ; Messer's, he thinks, not quite up to it ; thinks George's not quite to the line, but can't

positively say. At request of plaintiffs he started once to run the line on a due course from the corner on Peach creek to the corner on base line, but was stopped by Tilley at his plantation; thinks Benton and Stubbs followed his marks made in 1849, as he did not find any marked trees beyond the timbered lands when he run the line, but marked some on the line of the fences himself; does'nt think his marks could have looked 12 or 15 years old. The line from the corner on the base line running to Caney would not meet the line from Peach creek by 30 or 40 varas. It is generally difficult to survey through cane brakes and especially at crossing of Caney. Has found some of the old surveys crooked and some that would not close, and some in this part of his district by 100 varas; the practice of surveyors in running old lines, is to go from one marked tree to another even if they vary from the direction. From the point to which he found marked trees on the line from Peach creek it is about three miles to the back line of the league. To follow that line would miss the corner on the back line some 100 varas. In 1849, when he traced the line, thinks there were about 3 acres of Higgin's field and 5 of Cage's up to the Tone line and on the disputed ground. Mrs. Wheeler was married in 1842 to her present husband and was then about 17 years old.

The titles of both parties to the respective halves of the league were admitted.

The charges given by the Court were as follows, asked by the plaintiff:

1st. If the jury believe that the line was not run fairly and according to the contract, and was run by the defendants and did not divide the land fairly, it would not bind the plaintiffs unless the line was assented to by the parties under whom they claim.

2nd. That no agreement which Lacy might make in regard to the land, would bind Lavinia Hunter, the daughter of the grantee of the land.

3rd. A party must possess the disputed part of the land and must live upon that part and clear and cultivate it, or enclose it, or he cannot acquire it by limitation.

4th. The party claiming the benefit of limitation must himself show how much of the land in dispute he has lived upon, cultivated or enclosed in order to claim it by the law of limitation.

6th. The plea of the statute of limitations is affirmative, and the defendants must prove positively how much they have possessed under deed duly recorded, more than five years before the suit was instituted.

8th. If a dividing line had been run but not accurately, the parties that would be injured by it would not be bound by the division, unless they had a knowledge of the dividing line, had participated in running it or knowing what it was, assented to it.

9th. That no authority of Lacy to have the land divided would bind Mrs. Lacy, his wife, if a portion of it belonged to her separately and apart from her husband, if the division was made unfairly or injuriously to her interest, provided she did not know of it and assent to it.

Charges asked by defendants and given :

That if the jury believe from the evidence that the dividing line between the upper and lower half of the Hunter land has been run, and that the parties or those under whom they claim have acquiesced in the same and recognized the said dividing line, they will find for the defendants.

Lines actually marked must be adhered to, though they may vary from the course.

The marked trees by which neighbors hold their lands, when proved, ought not to be departed from, though not exactly agreeing with the description in the conveyance.

A line actually marked for a dividing line is to govern, although not a right line from corner to corner. Where a line has been marked part of the way, the boundary for the resi-

due of the distance is to be a straight line from the last marked tree or other trace to the next marked tree or corner.

If the jury believe from the evidence that the divisional line has been marked between the upper and lower half of the Hunter league for only a part of the way, it must be held good as far as it goes, and the line will be held to continue in a direct course to the end of it, or the corner, if one can be found.

That old boundaries which have been long settled and acquiesced in ought not to be disturbed, because of inaccuracies in the measurement or quantities.

If the jury believe from the evidence that the defendants and those under whom they claim, have been in the peaceable and undisturbed possession of the lands claimed by them up to the boundary set up by them, under title duly recorded, from the original grantee down to them, using, cultivating and enjoying the lands for five years before the filing of this suit, they will find for the defendants.

One who claims under a deed is estopped from denying any fact alleged in it, or any deed to which it refers.

Verdict and judgment for the plaintiffs; motion for a new trial overruled.

*Quinan* and *Ballinger*, for appellants.

*J. W. Harris*, for appellees.

WHEELER, J.  The demurrer was general: and it is well settled that, upon appeal from the judgment overruling a general demurrer to a petition, no grounds of demurrer will be considered which do not go to the plaintiff's right of action. It cannot be denied, that, if, as alleged, the division line between the owners of the upper and lower halves of the league had never been run, it was the right of the parties to have it run, according to the original conveyance from Hunter to George;

and that it was a wrong in any one to obstruct and prevent the running of it. It is objected, that it is not averred what injury the plaintiffs have sustained, or are likely to sustain by reason of the alleged refusal of the defendants to permit the line to be run. But it is a matter of which the Court may judicially take notice, and need not be informed by averment, that the owners of lands thus situated will be likely to sustain injury by not having the boundaries of their land ascertained and defined. That is the probable consequence and . the reasonable presumption.

The right to have the line of division run, in such a case, and to maintain an action, if necessary for that purpose, rests on the same principle as the right to an action for specific performance, where there is a contract to convey. The deed from Hunter to George, though an executed conveyance, passing the title, did not ascertain the boundaries of the land conveyed, but only gave a description by which they might be ascertained, by an actual survey thereafter to be made, in the manner indicated. As to the running of this line, it was in the nature of an executory contract, which may be enforced by suit for specific performance.

Whether the plaintiffs should not have stated their case with more particularity, especially the acts of the defendants, of which they complained, it is not necessary to consider; as the petition, in this respect, was not questioned by exceptions. It was sufficient on general demurrer.

But the case stated in the petition manifestly was not the case made out in evidence. It was proved incontestibly that the dividing line had been run as early as 1835 : and it was not proved that the defendants had been amicably requested and had refused to consent to the running of the line, or to permit it to be run. The line had been actually run and marked ; was capable of being found and traced ; some of the defendants had occupied up to it since 1835 ; it was known to the plaintiffs and had been recognized by them ; it had even

been traced by a Surveyor at their instance, who met with no interruption from any of the defendants, while tracing the line actually run, but only when he undertook to run a new line. The essential averment of the plaintiffs, on which their right of action depended, that is, that the line had not been run, was thus disproved; and this was an answer to their case.

But it is objected that this line, which, it is admitted, was commenced, was never completed. Upon this point the evidence is not conclusive. Some of the witnesses found and traced the line a considerable part of the distance, and found what they took to be the line nearly the whole of the way.— There seems little reason to doubt that the line was completed, though not very accurately run. Messer proved the running of it a part of the way; and the plaintiffs' witness, Collinsworth, testifies that he found and traced the line a considerable part of the distance from the beginning point, or corner on Peach creek. He also found a corner marked on the base line, and a line running from it, approaching the line from the beginning corner, but which, if extended, would not meet the latter. This proves simply that the line was not run with perfect accuracy; but it by no means proves that the running of it was not completed. Such inaccuracies, and even greater, as this witness, who was the District Suraeyor, testifies, are not uncommon. They do not invalidate surveys. If they did, there would be little security in titles; especially in the earlier titles of this country. Even if the line cannot be found in its whole extent; or if it was not actually run through; yet as its two extremes can be found, and it can be traced for a part of the distance, it is not to be disregarded. In such cases, the course to be pursued is plain. The marked lines are to be followed as far as any trace of them can be found, and the connections made. The lines actually marked must be adhered to, though they vary from the course. (2 Overt. 304; Newson v. Pryor 7 Wheat. 7.) A line actually marked for the survey is to govern the boundary, although

not a right line from corner to corner. Where a line has been marked only a part of the way, the boundary for the residue of the distance will be a direct line from the termination of the marked line, to the point of intersection, or to the corner called for. (2 Bibb, 261 ; Preston's heirs v. Browne, Id. 493 ; 4 Id. 503 ; 4 Monr. 29; 7 Id. 333.) Where a division line exists, at its two extremities, and for a principal part of the distance, it will be considered a continuous line. (6 Wend. 467.)— Nothing can be more clearly or certainly settled, than that, where a marked line can be found, it shall be pursued, as far as may be done, in its whole extent ; but if it does not extend to the point of intersection, then it must be continued until the intersection is made, taking the course called for or required by the deed. (1 Marsh. 382 ; 4 Monr. 39.) And the rule is the same, whether the deed or conveyance refer, for its boundaries, to the marked lines or monuments, or they be afterwards marked and established by the parties. (13 Pick. 267 ; 12 Mass. 469 ; 17 Id. 212.) If, therefore, the line cannot be traced in its whole extent, still it is to be observed, and cannot be departed from where it can be found and traced ; especially after such a lapse of time, and so long continued occupancy in reference to it.

It is by no means certain, however, from the evidence, that this line may not be traced with reasonable certainty, in its whole extent, by the use of sufficient industry and attention. It can be traced far enough, at least, to show that it was actually run ; and it is proved indisputably, that it was run as the dividing line between the proprietors of the upper and lower halves of the league, nearly a quarter of a century ago ; it has been occupied by the owners of the upper half ever since, and has been acquiesced in by all the parties in interest. Where the parties have agreed upon and marked a boundary line, and the possession is in accordance with it for such a length of time as may give title by disseizin, the line cannot be disturbed, although found to be erroneously established, unless

there be clear proof that the possession was not adverse.   (4 Shep. 23.)

But it is objected that the owners of the lower half were a married woman and a minor ; and there is no proof of their consent to the running of this line.   There is proof, however, that Lacy, the husband, assented to the running of it : and if it were necessary to the just decision of the case, as we shall see it is not, it might very well be held that the husband is competent to represent his wife in the matter of running a boundary line.   If done fairly and honestly, and acquiesced in by her, it ought to be as binding upon her as upon others.— So an infant, acquiescing in the settlement of boundaries, after coming of age, will be bound by it.   If he do not dissent when he comes of age, but acquiesces, he is forever bound.— (Brown v. Caldwell, 10 Serg. and R. 114.)   As has been said, "These settlements of boundary are common, beneficial, ap-"proved and encouraged by Courts, and ought not to be dis-"turbed, though it was afterwards shown that they had been "erroneously settled, if they have been acquiesced in for a num-"ber of years."   "Convenience, policy, necessity, justice, all "unite in favor of supporting such an amicable adjustment."— (Id. 116.)   It is beneficial to all concerned, as well married women and minors as others.   It is to be observed that neither Mrs. Lacy nor her daughter ever expressed any dissatisfaction with this line, though the latter was of age before she parted with the title.   They are not the parties who have complained. They and their husbands acquiesced in it ; and had they re-tained the title to the present time, they doubtless would still have acquiesced in it.   It cannot be doubted that its existence was known to them.   There is no pretence of any fraud, or unfairness in the running of it ; and the inequality it produces in the quantity of acres of the respective proprietors, the ex-tent of the survey being considered, is, at most, very inconsid-erable.   The acquiescence of the parties under whom the plaintiffs claim, for so great a lapse of time, under the cir-

cumstances, ought to bind them, if there were no evidence of the express assent and recognition of it by the plaintiffs' vendors. But there is evidence of such assent and recognition, which relieves the case of all difficulty. In the deed of partition between Mrs. Lacy and her daughter, then also a married woman, this dividing line is expressly recognized. One of the calls of the deed is " to commence on Peach creek, at the di- " viding line between the upper half and the lower half of the " said league No. 3, thence up the said dividing line," &c.— And again, " to commence on the corner of the dividing line," &c. They thus refer to this line as the boundary of their land ; and recognize it as such by their deed executed and acknowledged with all the formalities necessary to pass their title. And afterwards in their deeds of conveyance to the plaintiffs, they again refer to and convey by this line as their boundary line. By commencing at the " dividing line " and running " up the dividing line " they of course mean a real, not an imaginary line. It is thus placed beyond doubt or cavil, that the line was known and recognized by them as their true boundary, by which they conveyed to the plaintiffs. After such a recognition of it, they could not have disturbed it if they would. Much less can the plaintiffs, claiming under them by deeds which convey the title by this boundary line. They knew what they were buying, and by what line it was bounded ; it was a well known line ; the occupancy by the defendants upon it was notice to them of their understanding of it ; their own deeds called for it ; they have obtained all they bargained for and have no cause to complain. They cannot set up the rights of the married women, from whom they purchase, to maintain rights in themselves, which their vendors neither asserted, nor pretended to convey to them. They cannot complain that the former did not sell to them all they might have sold by insisting upon a different division. They hold to the boundaries called for in their deeds ; and that is all they can ask, however it might have been with their ven-

dors. They, in a word, have not shown the pretence of a right to come in, at this late day, and under their recent purchases, to disturb the peace of the neighborhood, and unsettle land marks and boundaries that have been established and acquiesced in for nearly a quarter of a century. If suits of the character of the present were encouraged, the mischiefs to which it would lead, it may readily be conceived, would indeed be of serious consequence. But fortunately for the peace of society, the well settled principles of the law, no less than reason, justice and sound policy, forbid the Courts to encourage or countenance by their sanction, pretensions, so adverse to private rights and the public tranquility.

It is clear, beyond controversy, that the dividing line or boundary, which it was the professed object of this suit to run and establish, had been run, established and acquiesced in by those under whom the plaintiffs claim, long before the institution of this suit; whether actually run and marked in its whole extent from corner to corner, is immaterial; as enough was done to enable the parties readily to ascertain where it was intended to run, and must have run had it been extended through. It was well known to the plaintiffs, as is shown by the evidence, which not only disproves the gravamen of their complaint, and defeated their right of action, but made out and established incontestibly, the case of the defendants. It results that the verdict of the jury was contrary to law and the evidence, for which the judgment must be reversed.

An examination of the rulings of the Court upon the defence of the statute of limitations, as applied to the evidence, would, it is believed, lead to the same conclusion. But the defendants do not need the aid of the statute to protect their rights; and it would be an unprofitable consumption of time, to examine the evidence and the rulings of the Court upon that subject.

As the case must be remanded, it is proper to notice a question raised upon the trial and noticed in argument here, upon the

admissibility of evidence. The plaintiffs objected to proof of the declarations of Tone, the Surveyor, when running the line in 1835, to the effect, that he was making the survey to establish the dividing line, between the upper and lower halves of the league, for the parties, and by their request, as they were dissatisffed with the old line : which, it seems, had been run in 1832. The bill of exceptions does not state on what ground the evidence was objected to. The objection was overruled, and rightly. If it was intended by the objection, that Tone ought to have been produced as a witness, it should have been so stated, and his absence might then have been accounted for. He was a public Surveyor, and his declarations while making the survey, were clearly admissible as a part of the original *res gestae*. (1 Greel. Ev. 145 n.) On these questions of boundary, the Courts have gone much further, and, under certain restrictions, have freely admitted hearsay evidence to establish old surveys and boundary lines. (Ib. ; 1 Cow. and Hill's Notes to Phil. Ev. Note, 186 to p. 239 ; Blaythe v. Sutherland, 3 McCord, 158.) In the last case cited, the Circuit Court rejected the testimony of a witness, who detailed the information he had received from the Surveyor, as to the situation of the lines, because the Surveyor's death had not been proved ; but the appellate Court held the testimony admissible ; and the omission to prove the death of the Surveyor appearing to have been inadvertent, they granted a new trial, with a view that the formality might be supplied. In that case the information was derived from the Surveyor after the running of the lines ; it was, therefore, but heresay ; and not, as in this case, a part of the *res gestae ;* which is always admissible, not as secondary, but as primary evidence.

The judgment is reversed and the cause remanded.

Reversed and remanded.